# In the United States Court of Federal Claims

No. 08-791C
Filed: June 30, 2009
**TO BE PUBLISHED**

*******************************************

|  |  |  |
|---|---|---|
| | * | |
| UNITED SURETY & INDEMNITY | * | |
| COMPANY, | * | |
| | * | |
| Plaintiff, | * | Doctrine of Equitable Subrogation; |
| | * | Miller Act, 40 U.S.C. § 3131(a)-(b); |
| v. | * | Motion to Dismiss, |
| | * | RCFC 12(b)(6); |
| THE UNITED STATES, | * | Performance and Payment Bonds. |
| | * | |
| Defendant, | * | |
| | * | |
| and | * | |
| | * | |
| SELPA CONSTRUCTION & RENTAL | * | |
| EQUIPMENT, | * | |
| | * | |
| Third-Party Defendant. | * | |
| | * | |

*******************************************

**Antonio Borres-Otero,** Saldana Egozcue, P.S.C., San Juan, Puerto Rico, Counsel for Plaintiff.

**Jeffrey Andrew Regner,** United States Department of Justice, Civil Division, Washington, D.C., Counsel for Defendant.

## MEMORANDUM OPINION AND FINAL ORDER

**BRADEN,** *Judge*.

## I.   RELEVANT FACTUAL BACKGROUND.[1]

On February 6, 2001, the United States Postal Service ("USPS") awarded Selpa Construction & Rental Equipment Corporation ("Selpa") a contract, #332495-00-B-0221 ("the Contract"), to

---

[1] The facts cited herein were derived from the November 4, 2008 Complaint ("Compl."), Plaintiff's attached exhibits ("Pl. Ex. 1-9"), the Defendant ("the Government")'s January 22, 2009 Motion To Dismiss ("Gov't Mot."), and the Government's attached exhibits ("Gov't Ex. A-D").

construct a post office in Fajardo, Puerto Rico.  *See* Compl. ¶ 4.  The initial amount of the Contract was $2,288,000.00, but the amount was later increased to $2,568,648.60 through change orders.  *Id*. Clause B-8, found in the USPS Procurement Manual and incorporated into the Contract, prohibited assignment of the Contract to any party other than a bank, trust company, or financial institution.[2] *See* Gov't Ex. B.

---

[2] Clause B-8 of the Contract states:

a.  If this contract provides for payments aggregating $10,000 or more, claims for monies due or to become due from the Postal Service under it may be assigned to a *bank, trust company, or other financing institution*, including any federal lending agency, and may thereafter be further assigned and reassigned to any such institution. Any assignment or reassignment must cover all amounts payable and must not be made to more than one party, except that assignment or reassignment may be made to one party as agent or trustee for two or more parties participating in financing this contract.  *No assignment or reassignment will be recognized as valid and binding upon the Postal Service unless a written notice of the assignment or reassignment, together with a true copy of the instrument of assignment, is filed* with:

> (1) The contracting officer;
> (2) The surety or sureties upon any bond; and
> (3) The office, if any designated to make payment, and the contracting officer has acknowledged the written assignment.

b.   Assignment of this contract or any interest in this contract other than in accordance with the provision of this clause will be grounds for termination of the contract for default at the option of the Postal Service.

Gov't Ex. B (emphasis added).

As required by the Miller Act, 40 U.S.C. § 3131 *et seq.*,[3] Selpa obtained two bonds from United Surety & Indemnity Company ("United Surety"), a performance and payment bond surety incorporated under the laws of the Commonwealth of Puerto Rico.  *See* Compl. ¶¶ 2, 5.  United Surety issued a payment bond for $1,144,000.00 and a performance bond for $2,288,000.00 in partial consideration of Selpa's execution of an August 26, 1996 General Agreement of Indemnity ("General Agreement").  *See* Pl. Ex. 2, 3.  Pursuant to the General Agreement, Selpa assigned and declared United Surety's rights to be subrogated to Selpa's rights.  *See* Pl. Ex. 3.  Article 19 of the General Agreement provided that United Surety had the right to "control, administer, operate or manage any matters connected with the performance of any contract [covered by such bond or bonds] for the purpose of minimizing any possible loss or ultimate loss to [United Surety]."  Pl. Ex. 3.

Pursuant to the Contract, Selpa agreed to furnish all labor and materials and perform all work. *See* Pl. Ex. 1.  During construction of the post office, however, Selpa's "financial condition precluded it from performing under the Contract."  Compl. ¶ 8.  On October 17, 2002, USPS informed Selpa that USPS had received subcontractor requests for payment.  *See* Pl. Ex. 8.  The Complaint alleges that sometime thereafter United Surety "agreed to provide [Selpa] the necessary funds to complete the [p]roject and, thus, became a performing surety."  Compl. ¶ 8.

---

[3] Section 3131 of Title 40 of the United States Code provides in part:

(b) Type of bonds required.– Before any contract of more than $100,000 is awarded for the construction, alteration, or repair of any public building or public work of the Federal Government, a person must furnish to the Government the following bonds, which become binding when the contract is awarded:

(1) Performance bond.– A performance bond with a surety satisfactory to the officer awarding the contract, and in an amount the officer considers adequate, for the protection of the Government.

(2) Payment bond.– A payment bond with a surety satisfactory to the officer for the protection of all persons supplying labor and material in carrying out the work provided for in the contract for the use of each person.  The amount of the payment bond shall equal the total amount payable by the terms of the contract unless the officer awarding the contract determines, in a writing supported by specific findings, that a payment bond in that amount is impractical, in which case the contracting officer shall set the amount of the payment bond.  The amount of the payment bond shall not be less than the amount of the performance bond.

40 U.S.C. § 3131(a)-(b).

On November 12, 2002, United Surety advised USPS that:

> On behalf of United Surety & Indemnity Company, the insurance company that
> issued Payment and Performance Bond No. 0172359 for the "Fajardo PR Main Post
> Office, New Construction Ownwd [sic] FMS #A42128; Contract No. 332495-00-B-
> 0221", you are hereby required that from this date on, all payments due to Selpa
> Construction Corp. under the construction contract for said project, be made by
> checks payable to United Surety & Indemnity Company and Selpa Construction
> Corp.
>
> Pursuant to Article 19 of the General Agreement of Indemnity executed, among
> others, by Selpa Construction Corp., United Surety & Indemnity Company has taken
> control of the proceeds of the construction contract.
>
> Should you have any questions in relation to this requirement, please call the
> undersigned.

Pl. Ex. 4.

On January 27, 2003, Selpa's bank, Scotiabank de Puerto Rico ("Scotiabank"), notified
USPS that all contract payments should be made jointly to Selpa and Scotiabank, pursuant to a valid
assignment of contract payments signed by Selpa.  *See* Pl. Ex. 5.  On February 4, 2003, USPS sent
Selpa a letter requesting payment instructions, in light of Scotiabank's January 27, 2003 request for
remittance of all future payments and a February 3, 2003 telephone conversation, wherein Selpa
requested that all future payments be made to United Surety and Selpa.  *Id*.

On or about March 26, 2003, USPS made a progress payment in the amount of $201,795.00
to Selpa and Scotiabank.  *See* Compl. ¶ 12.  By this time, United Surety had expended at least
$168,481.01 to complete the project, and "USPS was well aware that [United Surety] had been
financing the project and that multiple claims were being received from suppliers."  *Id*. ¶¶ 14-15.
On April 3, 2003, Selpa sent a letter to reassure USPS that Selpa, with the assistance of United
Surety, intended to finish the project, and requested that fifty percent of the retainage be paid to
United Surety:

> As we have notified you before, in the last few months we have been working hard
> [o]n the project with the assistance of the surety company United Surety & Indemnity
> Co., making the payments of payroll and suppliers of the forementioned project.
> Also, as you notified us some time ago, the bank, Scotiabank of Puerto Rico[,]
> demanded in a letter that all the remaining payments of the contract principal, not the
> retainage must be directed to them.
>
> [It] is for that reason, that we are gently requesting you, that the U.S.P.S. can issue
> a partial check of the 50 (fifty) percent of the amount of that retainage, payment to

4

United Surety & Indemnity Co.  In that way, that check will reduce, along with another check that we have already delivered to the Surety, the amount that they have paid already for the project and is a good will gesture that shows that Selpa wants to finish his job with the USPS, pay all the people involved in this project and follow the agreements with the Surety.

Pl. Ex. 7.

By an April 8, 2003 letter, United Surety's counsel requested that USPS reimburse United Surety for the funds disbursed on March 26, 2003 to Selpa and Scotiabank.  *See* Pl. Ex. 9.  United Surety's counsel informed USPS that "[w]hen [United Surety] questioned Selpa regarding the receipt of the aforementioned payment it disclosed that the funds had been deposited in Scotiabank de Puerto Rico since they were allegedly assigned to said banking institution under certain Assignment of Contract Payments executed on November 17, 2000." *Id*.  Because United Surety informed USPS on November 12, 2002 that all future payments should be made to Selpa and United Surety, the March payment made to Selpa and Scotiabank was "null and void." *Id*.

On July 8, 2003, the Contract was terminated for default.  *See* Compl. ¶ 17.  On January 28, 2004, United Surety and USPS entered into a Takeover Agreement to complete the project.  *Id*.  The Takeover Agreement "outlined the then-current contract balance of $390,239.19[,] including the payment of $201,795.00 to Selpa, and set forth the terms on which [United Surety] would complete the project." Gov't Mot. at 4; Gov't Ex. C.  The project was completed at a net cost to United Surety of $2,034,936.42.  *See* Compl. ¶ 18.  To date, USPS has not paid United Surety the $201,795.00 payment made to Selpa and Scotiabank.  *Id*. ¶ 20.

## II.   PROCEDURAL HISTORY.

On November 4, 2008, United Surety filed a Complaint in the United States Court of Federal Claims, together with exhibits, alleging wrongful disbursement of contract funds and equitable subrogation.  *See* Compl. ¶¶ 29-30.  United Surety requests damages in the amount of $201,795.00, plus interest, as well as certain costs and expenses.  *Id*.

On December 12, 2008, the Government filed an Unopposed Motion For Extension Of Time to file an Answer or Motion to Dismiss, that the court granted on December 15, 2008.  On January 22, 2009, the Government filed a Motion To Dismiss, pursuant to RCFC 12(b)(6), together with attached exhibits.  In addition, on January 27, 2009, the Government filed a Third-Party Complaint against Selpa, and the court issued a summons.  To date, the Government has not been able to serve Selpa with the Third-Party Complaint.

On March 2, 2009, United Surety filed a Response ("Pl. Resp.") to the Government's Motion To Dismiss.  On March 14, 2009, the Government filed a Reply ("Gov't Reply").

III.    DISCUSSION.

A.    Jurisdiction.

The jurisdiction of the United States Court of Federal Claims is established by the Tucker Act. *See* 28 U.S.C. § 1491. This Act authorizes the court "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." *Id*. § 1491(a)(1). The Tucker Act, however, is "a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages . . . [T]he Act merely confers jurisdiction upon it whenever the substantive right exists." *See United States* v. *Testan*, 424 U.S. 392, 398 (1976). Therefore, a plaintiff must identify and plead an independent contractual relationship, constitutional provision, federal statute, or executive agency regulation that provides a substantive right to money damages. *See Fisher* v. *United States*, 402 F.3d 1167, 1171 (Fed. Cir. 2005) (*en banc*) ("The Tucker Act itself does not create a substantive cause of action; in order to come within the jurisdictional reach and the waiver of the Tucker Act, a plaintiff must identify a separate source of substantive law that creates the right to money damages."). The burden of establishing jurisdiction falls upon the plaintiff. *See FW/PBS, Inc.* v. *Dallas*, 493 U.S. 215, 231 (1990) (holding that the burden is on the plaintiff to allege facts sufficient to establish jurisdiction); *see also* RCFC 12(b)(1).

The November 4, 2008 Complaint invokes 28 U.S.C. § 1491(a)(1) and the doctrine of equitable subrogation as a basis for the court's jurisdiction: "as a performing and paying surety, [United Surety] is entitled by subrogation[] to file a claim in this court against the [Government] to recover damages suffered as a result of the March 26, 2003 payment wrongfully made by [] USPS in favor of Scotiabank and [Selpa]." Compl. ¶ 27. The Complaint alleges that by March 26, 2003, United Surety, the "performing surety," was "financing the [p]roject," and "ha[d] made payments under the bonds to complete the project for, at least, $168,481.01." *Id*. ¶¶ 8, 13, 14. The Complaint also states that on January 28, 2004, United Surety and USPS entered into a Takeover Agreement "to complete the project." *Id*. ¶ 17. Although, the Government does not challenge the Court's jurisdiction, the court "is always responsible for its own jurisdiction." *Fisher*, 402 F.3d at 1173; *see also Consolidation Coal Co.* v. *United States*, 351 F.3d 1374, 1378 (Fed. Cir. 2003) ("[U]nder federal rules any court at any stage in the proceedings may address jurisdictional issues. Thus, even if the issue is not properly raised, this court *sua sponte* may consider all bases for the trial court's jurisdiction.").

It is well settled that a surety bond "creates a three-party relationship, in which the surety becomes liable for the principal's debt or duty to the third party obligee." *Ins. Co. of the W.* v. *United States*, 243 F.3d 1367, 1370 (Fed. Cir. 2001) ("*Ins. Co. of the W. I*"). A third-party, however, does not have privity of contract with the Government. Nonetheless, the United States Court of Appeals for the Federal Circuit has held that, "[i]f a surety is unable to rely on privity of contract as the jurisdictional basis for a claim against the Government, the surety may be able to

6

invoke the doctrine of equitable subrogation to step into the shoes of the contractor for the purpose of satisfying the jurisdictional requirements of the Tucker Act, 28 U.S.C. § 1491(a)." *Nat'l Am. Ins. Co.* v. *United States*, 498 F.3d 1301, 1304 (Fed. Cir. 2007). To "maintain a claim for equitable subrogation, a surety must either take over contract performance or finance the completion of the defaulted contract under its performance bond." *Admiralty Const., Inc. by Nat. Am. Ins. Co.* v. *Dalton*, 156 F.3d 1217, 1222 (Fed. Cir. 1998).

Because United Surety became a performing and paying surety for Selpa, United Surety has satisfied the jurisdictional requirements of the Tucker Act under the doctrine of equitable subrogation. *See Nat'l Am. Ins. Co.*, 498 F.3d at 1307 ("[O]ur binding precedent clearly holds that a payment bond surety that discharges a contractor's obligation to pay a subcontractor is equitably subrogated to the rights of both the contractor and the subcontractor, as demonstrated by the preceding discussion."); *see also Balboa Ins. Co.* v. *United States*, 775 F.2d 1158, 1163 (Fed. Cir. 1985) ("[W]e hold that both the Claims Court and this court have jurisdiction to hear the claim of a Miller Act surety against the United States for funds allegedly improperly disbursed to a contractor.").

## B.    Standing.

The United States Supreme Court has held that "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth* v. *Seldin*, 422 U.S. 490, 498 (1975). Standing must be determined "as of the commencement of suit." *Rothe Dev. Corp.* v. *Dep't of Def.*, 413 F.3d 1327, 1334 (Fed. Cir. 2005). The party invoking federal jurisdiction bears the burden of establishing standing. *See Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Specifically, to establish standing, "a plaintiff must show [that] it has suffered an 'injury in fact' that is . . . concrete and particularized and . . . actual or imminent, not conjectural or hypothetical; . . . the injury is fairly traceable to the challenged action of the defendant; and . . . it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan*, 504 U.S. at 560-61).

A Miller Act surety has standing to maintain an action in the United States Court of Federal Claims, if the surety:  (1) asserts its own rights under a takeover agreement between the surety and the Government for assuming the obligations of the defaulting contractor; or (2) invokes the doctrine of equitable subrogation. *See Nelson Constr. Co.* v. *United States*, 79 Fed. Cl. 81, 90 (2007) ("Pursuant to the doctrine of equitable subrogation, either a payment bond or performance bond surety[] has standing to sue the government because the government is clearly the primary beneficiary of the surety's obligation and it would be inequitable to allow it to retain monies which it has previously agreed to pay for work done.") (internal quotation omitted). In this case, United Surety is a Miller Act surety, has invoked the doctrine of subrogation, and properly has alleged an injury in fact "traceable to the challenged action of the defendant." *Lujan*, 504 U.S. at 560-61. Thus, the court has determined that United Surety has standing to file this action.

**C.      Standard For Decision On A Motion To Dismiss, Pursuant To RCFC 12(b)(6).**

Although a complaint "attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007) (citations omitted); *see also Am. Contractors Indem. Co.* v. *United States*, — F.3d —, 2009 WL 1841629, at *5 (Fed. Cir. June 29, 2009) ("To avoid dismissal for failure to state a claim, the claimant must plead sufficient facts that, if taken as true, are enough 'to raise a right to relief above the speculative level.'") (quoting *Twombly*, 550 U.S. at 555). In order to survive a motion to dismiss, however, the court "[does] not requir[e] heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; *see also* RCFC 12(b)(6) ("Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, or third-party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: . . . (6) failure to state a claim upon which relief can be granted[.]").

When reviewing a motion to dismiss for failure to state a claim upon which relief may be granted, the court "may begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1940 (2009). Legal conclusions must be supported by factual allegations. *Id.* "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

In addition, under RCFC 12(d), the court may rely on undisputed documents attached as exhibits to a complaint without converting a motion to dismiss to a motion for summary judgment. *See Akins* v. *United States*, 82 Fed. Cl. 619, 622 (2008) ("Where [] the Court relies only on undisputed documents attached as exhibits to the Complaint, the Court may proceed without converting the motion to dismiss to one for summary judgment."); *see also* RCFC 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."); RCFC 12(d) ("If, on a motion under RCFC 12(b)(6) . . . matters *outside the pleadings* are presented to and not excluded by the court, the motion must be treated as one for summary judgment under RCFC 56.") (emphasis added). In this case, the exhibits attached to Plaintiff's Complaint are not in dispute.

IV.     **THE RESOLUTION OF THE GOVERNMENT'S JANUARY 22, 2009 MOTION TO DISMISS, PURSUANT TO RCFC 12(b)(6).**

A.      **The Parties' Arguments.**

1.      **The Government's Argument.**

The Government moves to dismiss the November 4, 2008 Complaint for failure to state a claim upon which relief can be granted, because the Government "owed no duty to direct the March 26, 2003 progress payment to [United Surety.]" Gov't Mot. at 5. The Government claims that the November 12, 2002 letter from United Surety to USPS was insufficient as a matter of law to require USPS to make the March 26, 2003 payment to United Surety. *Id*. The November 12, 2002 letter referred only to an assignment from Selpa to United Surety, which is invalid under Clause B-8 of the Contract, and failed to assert any default by the contractor under either the performance or the payment bond. *Id*.

Without adequate notice, the Government owes no duty to direct progress payments to a surety during the course of a construction project. *Id*. at 5-6. The required notice must provide facts giving rise to the equitable subrogation by the surety, including the facts related to the contractor's default or imminent default. *Id*. at 6. Absent such notice, "[t]he Government has no obligation to suspend a progress payment merely on the unsupported request of a contractor's surety." *Id*. In fact, the Government "does not owe the surety a duty, other than to materially comply with the terms of the construction contract, until the surety elects to perform under the bonds." *Id*. If the contractor defaults, the Government becomes a stakeholder in the project funds to the extent of the surety's performance. *Id*.

The November 12, 2002 letter did not notify USPS that Selpa was in default or imminent default. *Id*. at 6-7. It informed USPS only of the General Agreement between Selpa and United Surety and that future payment should be payable to both. *Id*. at 7. A general indemnity agreement is an assignment between a surety and a principal, and Clause B-8 of the Contract renders such an assignment invalid, because United Surety, as a surety, is not an entity to which an assignment may be made. *Id*.

At the time of the March 26, 2003 payment, USPS was aware that certain subcontractors had not been paid, but this fact did not put USPS in the role of a stakeholder. *Id*. at 8. Until the surety gives the Government proper notice that the contractor is in default under the bond, triggering the surety's duty to perform, the Government has no duty to suspend or redirect payment. *Id*.

Even if United Surety had provided USPS with adequate notice prior to the March 26, 2003 payment, USPS would not have been required to withhold the March 26, 2003 payment, "because USPS was already retaining funds in excess of [United Surety's] alleged subrogation rights." *Id*. at 9. If the Government is holding funds in excess of the surety's right of equitable subrogation, it

9

remains free to make progress payments under the ongoing contract. *Id*. (citing *Nat'l Sur. Constr. Corp*. v. *United States*, 118 F.3d 1542 (Fed. Cir. 1997)).

According to the Takeover Agreement, entered into nearly a year after the March 26, 2003 payment, USPS retained $390,239.19. *Id*. at 10; *see also* Gov't Ex. A. United Surety alleges that by March 26, 2003, it had paid $168,481.01 under the bonds to complete the project. *See* Compl. ¶ 14. Thus, in March 2003 (*i.e.*, at the time of the disputed payment), USPS was not a stakeholder in $168,481.01, as it "held in excess of that amount." Gov't Mot. at 10. USPS did not become a stakeholder in the remaining project funds until United Surety and USPS entered into a Takeover Agreement almost a year later. *Id*.

## 2. **Plaintiff's Response.**

United Surety responds that the November 4, 2008 Complaint states sufficient facts to maintain a claim for equitable subrogation upon which relief may be granted. *See* Pl. Resp. at 5. The United States Court of Appeals for the Federal Circuit has specified two situations in which a surety may succeed to the contractual rights of a contractor: (1) the surety finances completion of the contract; or (2) the surety takes over completion of the contract. *See Admiralty Const., Inc. by Nat. Am. Ins. Co.* v. *Dalton*, 156 F.3d 1217, 1222 (Fed. Cir. 1998). In this case, both situations occurred. *See* Pl. Resp. at 7. First, United Surety "financed the prime contract, at which time the erroneous payment took place[.]" *Id*. Second, a takeover agreement was signed. *Id*. Therefore, United Surety succeeded the rights and obligations of Selpa. *Id*.

United Surety concedes that USPS "had no legal obligation to suspend a progress payment 'merely upon the unsupported request of a contractor's surety.'" *Id*. at 8 (quoting *Balboa Ins. Co.* v. *United States*, 775 F.2d 1158, 1164 (Fed. Cir. 1985)). Instead, United Surety argues:

> [t]his is why the Government . . . prefers not to tackle the fact that [United Surety] was performing at the time of the improper payment, and wants to put in controversy the nature and validity of the notice of November 12, 2002. . . . [O]nly in the absence of performance by the surety and knowledge of it by the Government would the notice of November 12, 2002 have been crucial.

*Id*. at 8-9.

The November 4, 2008 Complaint alleges that United Surety was performing and that USPS knew of United Surety's performance at the time the progress payment in question erroneously was made to Selpa and Scotiabank. *Id*. at 9 (citing *Fireman's Fund Ins. Co.* v. *United States*, 909 F.2d 495, 499 (Fed. Cir. 1990) ("Only when the surety may be called upon to perform, that is, only when it may become a party to the bonded contract, should the government owe it any duty.")). Because United Surety was performing the contract, notification to USPS that Selpa was in default or imminent default was "superfluous and unnecessary." *Id*. at 10.

In addition, once a surety pays or performs on a contract, subrogation becomes effective so that funds left in the project become security for the surety. *Id*. at 11. For this reason, if the Government "'impairs that security by, for example, paying it over to the contractor after notice, the surety has a cause of action against the owner.'" *Id*. at 12 (quoting *Home Ins. Co.* v. *United States*, 46 Fed. Cl. 160, 163 (2000)). United Surety had been providing funds to Selpa for the payment of payroll and subcontractors prior to March 26, 2003. *Id*. at 11. Therefore, Selpa's rights were subrogated to United Surety at the time of the Government's March 26, 2003 payment and United Surety has a valid cause of action against the Government. *Id*. at 11-12.

In the alternative, because USPS had knowledge that United Surety was performing the Contract, coupled with the November 12, 2002 letter, USPS had sufficient notice of the danger of Selpa's default to trigger the duty to safeguard the project's funds. *Id*. at 16. The notice requirement is not a "magical word" requirement, but is "general in nature and its application depends on the circumstances and specific facts of the case." *Id*. Moreover, the notice requirement is for the benefit of the surety, "so that the Government can take the necessary measures to safeguard the surety's interest and security[.]" *Id*. at 19. United Surety admits that the November 12, 2002 letter "was not and was not intended to be a notice of assignment and therefore, [United Surety] will not dispute that, if it were to be considered as such, it would have had no effect on the Government duty to direct payments to the surety." *Id*. at 17. Nevertheless, the letter notified USPS that United Surety was intervening in the Contract, obligating USPS to assess whether United Surety's intervention was warranted. *Id*. No further "substantiation" is required. *Id*. at 18.

Finally, the duty of USPS as a stakeholder arose and was effective at the time of the March 26, 2003 payment to Selpa and Scotiabank, "regardless of the amount of funds remaining in the contract." *Id*. at 19. The Government's argument that "a surety making payments to subcontractors is only subrogated to the extent of the amounts it has paid on behalf of the contractor" is without merit and has no support. *Id*. at 20. Plaintiff distinguishes the Government's reliance on *National Surety*, 118 F.3d 1542, explaining that:

> *National Surety* dealt with the Government impairing the surety's interest by not complying with the contractual requirement to withhold a 10 percent retainage, which was held to be security for the surety. What the case states . . . is that 'National Surety's recovery should not exceed any losses that ensued, directly or indirectly, from the impairment from the security.' . . . In other words, the surety cannot recover more than the actual damages suffered, not that damages are limited to the amount paid at a specific time. But furthermore, in *National Surety*, at the time the improper payment was made the surety had not started performance, thus at that moment, the *only security* was the 10 percent retainage. Therefore, under those facts, it is correct that the Government was free to make payments in excess of the retainage.

Pl. Resp. at 20 (emphasis in original) (quoting *Nat'l Sur. Constr. Corp*., 118 F.3d at 1548).

In contrast, upon performance of a surety, as in this case, the security is the *entire balance* of the contract, and the Government cannot dispose of any of those remaining funds. *Id*. at 21. Therefore, the Government's argument that it has a "free hand" to dispense contract funds without a full takeover by the surety is contrary to the concepts of a "stakeholder" and "subrogation." *Id*. at 22.

### 3.    The Government's Reply.

The Government replies that United Surety's position, if accepted, would require that the Government make payments to sureties before the Government has notice of a default. *See* Gov't Reply at 1.  At the time the disputed payment was made, USPS had knowledge that United Surety had financed $168,481.00 of the Contract. *Id*. at 2.  That information, however, did not obligate USPS to hold the remaining contract funds for the benefit Plaintiff. *Id*.  At the time of the progress payment on March 26, 2003, United Surety was not a party to the bonded Contract. *Id*.  In fact, Selpa was not terminated for default until July 3, 2003, and USPS did not enter into the Takeover Agreement with United Surety until January 28, 2004. *Id*.  Therefore, on March 26, 2003, USPS owed no duty to United Surety. *Id*. at 2-3.  Moreover, by invoking the assignment instead of asserting contractor default in the November 12, 2002 letter, United Surety attempted to minimize its own risk:

> [United Surety] could have taken over the project payments in March [] 2003 by giving USPS notice that it believed Selpa to be in default. . . . Instead, [United Surety] attempted to assert rights over contract payments through a purported assignment.  Giving notice of the assignment, had it been valid, instead of notice of default would have given [United Surety] assignment rights without invoking its obligation under the bond to complete the project.

*Id*. at 3.

United Surety should not be permitted the "fiction" of having the November 12, 2002 letter treated as an adequate notice of default, when it made no mention of Selpa's non-performance. *Id*. United Surety also does not meet its own test for subrogation, *i.e.*, that a "surety may succeed to the contractual rights of a contractor[] when it takes over completion of the contract itself or if it finances the contract to completion." *Id*. at 3-4 (quoting Pl. Resp. at 7).  By March 26, 2003, United Surety had neither taken over completion of the Contract nor financed completion of the Contract. *Id*. at 4.  Consequently, the Complaint fails to state a claim of equitable subrogation on which relief can be granted, and the November 4, 2008 Complaint should be dismissed. *Id*.

### B.    The Court's Resolution.

Pursuant to the Miller Act, a contractor awarded a contract of "more than $100,000 for the construction, alteration, or repair of any public building or public work of the Federal Government" is required to post two bonds:  a performance bond and a payment bond. *See* 40 U.S.C. § 3131(b).

A performance bond protects the Government, as the surety guarantees performance of the contract and completion of the project in the event of contractor default, whereas a payment bond protects all persons supplying labor and material, if the contractor ceases to pay. *Id.* § 3131(b)(1)-(2). If a contractor defaults and the surety is called upon to complete the project or ensure payment, the surety "steps into the shoes" of the contractor and becomes "subrogated to the contractual rights of the original contractor against the government." *Nelson Constr. Co.* v. *United States*, 79 Fed. Cl. 81, 90 (2007).

Under the doctrine of equitable subrogation, a performing or paying surety may recover: (1) contract funds still held by the Government as retainage; and (2) contract funds that were disbursed to the contractor after the surety notified the Government of the contractor's default. *See Ins. Co. of the W.* v. *United States*, 83 Fed. Cl. 535, 538 (2008) ("*Ins. Co. of the W. II*"). Notice, however, is a prerequisite. *See Ransom* v. *United States*, 17 Cl. Ct. 263, 272 (1989) ("[B]efore any obligation arises to withhold or divert funds, the Government must be notified that the suret[y] believe[s] the contractor is in default and cannot complete the contract."), *aff'd*, 900 F.2d 242 (Fed. Cir. 1990). Notice "from the surety to the government [is] essential, for the government owes no duty to the surety unless the surety notifies the government of the contractor's default under the bond." *Ins. Co. of the W. I*, 243 F.3d at 1371. As a matter of law, however, "[t]he stakeholder duty to act with reasoned discretion to protect the interests of the surety does not automatically require the Government to withhold progress payments." *Ins. Co. of the W. II*, 83 Fed. Cl. at 542-43. Instead, upon notice of contractor default, the Government is obligated only to "take reasonable steps to determine for itself that the contractor had the capacity and intention to complete the job.'" *Balboa Ins. Co.*, 775 F.2d at 1164.

United Surety argues that notice is unnecessary where the surety has been performing under the contract. *See* Pl. Resp. at 10. This argument, however, is unsupported by the case law. In *Fireman's Fund Ins. Co.* v. *United States*, the United States Court of Appeals for the Federal Circuit held that: "Only when the surety may be called upon to perform, that is, only when it may become a party to the bonded contract, should the government owe it any duty. The surety knows best when this may occur; *consequently, only notice by the surety triggers the government's equitable duty.*" 909 F.2d 495, 499 (Fed. Cir. 1990) (emphasis added). The law places the duty of notice on the surety, and only upon *notification* does the Government assume the duty to act "with reasoned discretion to protect the interests of the surety" in those funds. *See Balboa Ins. Co.*, 775 F.2d at 1162 ("[U]pon notification by the surety of the unsatisfied claims of the materialmen, the Government became a stakeholder with respect to the amount not yet expended under the contract that it holds at the time of notification of default."); *see also Am. Ins. Co.* v. *United States*, 62 Fed. Cl. 151, 153-56 (2004) (holding that despite the fact that the surety "assumed *de facto* managerial control over the project," the surety's right to equitable subrogation "never attached," because the surety failed to provide notification to the Government). Therefore, the dispositive question is not whether notice was necessary, but whether or not the surety exercised its duty to provide the Government with *adequate* notice to trigger the Government's stakeholder duty.

In the case at bar, USPS received a letter from United Surety approximately four months before the disputed payment, stating that USPS was "hereby required" to make all payments due under the Contract payable to United Surety and Selpa. *See* Pl. Ex. 4. In fact, the second paragraph of the letter advised USPS that "[p]ursuant to Article 19 of the General Agreement of Indemnity executed, among others, by Selpa Construction Corp., [United Surety] has taken control of the proceeds of the construction contract." *Id*. The letter, however, did not represent that Selpa had defaulted or was about to default under the Contract. *Id*. Consequently, the Government argues, the November 12, 2002 letter was insufficient as a matter of law to trigger USPS' equitable duty, since it referred only to an assignment between Selpa and United Surety that the Government does not recognize under Clause B-8 and did not assert default by the contractor of the performance or the payment bond. *See* Gov't Mot. at 5-7.

United Surety cites the United States Court of Appeals for the Federal Circuit's decision in *Balboa Ins. Co.* and responds that if the Government has knowledge of the surety's performance, the Government is "obliged to assess if said intervention by the surety was warranted or if the contractor could continue the project without assistance." *See* Pl. Resp. at 17. In *Balboa Ins. Co.*, however, notice from the surety was a prerequisite to the Government's duty to use reasonable discretion in distributing contract payments:

> It is common knowledge that contractors rely upon contract proceeds administered through progress payments to properly finance the contract. Thus, *the Government has no legal obligation to suspend a progress payment merely upon the unsupported request of a contractor's surety*. However, when a surety has informed the Government that the contractor is in default, the Government has an obligation to take reasonable steps to determine for itself that the contractor had the capacity and intention to complete the job.

775 F.2d at 1164 (emphasis added) (internal citations omitted).

United Surety also relies on the following language in *Insurance Co. of the West*:

> [T]he court in *Balboa* [held] that the Government does not incur a duty 'merely upon the unsupported request of a contractor's surety.' This statement leaves the door open to the conclusion that a surety's request that the Government divert contract funds directly to the surety could trigger the Government's duty toward the surety, *when the request is supported by some evidence or indication of a default.* In other words, the substantiation of the notice of default seems to have been what the court in *Balboa* was concerned with, not the question of actual versus potential default.

83 Fed. Cl. at 541 (emphasis added). This case, however, restates that a surety's request for future payments must include "some evidence or indication of a default." *Id*. Moreover, this has been governing precedent for over three decades. *See Am. Fid. Fire Ins. Co.* v. *United States*, 513 F.2d 1375 (1975). In *American Fidelity*, the plaintiff-surety sent a letter to the Government that

14

"demand[ed] . . . monies due under the contract be distributed to and placed with [the surety]." *Id.* at 1378 (internal quotation omitted).  Therein, the court stated that the surety's letter provided the Government with additional information to justify paying the surety instead of the contractor:

> [W]e point out that plaintiff surety's letter . . . specifically refers to the following sections of the California Civil Code: §§ 2847, 2848 and 2849.  We set the sections out below because we deem the reference to the sections very pertinent.  All of the sections are pertinent in situations when a principal on a bond, the contractor in this case, fails to pay laborers and materialmen or is in such a condition that he appears unable to pay.  None of the sections has any application unless there is a defaulting principal or one who is about to default.  Once there is a default by the principal, the sections provide in the surety's favor suitable rights including subrogation.  In other words, *reference to these sections of the California Civil Code coupled with the demand of the plaintiff surety was a caveat that a situation was arising wherein the contractor may default* and plaintiff surety wanted to preserve its right of subrogation.

*Id.* at 1379-1380 (emphasis added).

In this case, United Surety's November 12, 2002 letter contains no reference to an actual or potential default by Selpa.  *See* Pl. Ex. 4.  The letter requests that USPS direct all future payments to the surety and informs USPS that United Surety had "taken control of the proceeds of the construction contract," pursuant to Article 19 of the General Agreement.  *Id.*  The record is unclear whether United Surety provided a copy of the General Agreement to USPS.  Even if a copy had been provided, however, reference to Article 19 of the General Agreement does not suggest that Selpa was in default, because Article 19 provides:  "[i]n the event that it becomes necessary or advisable *in the judgment of the Surety* to control, administer, operate or manage any matters connected with the performance of any contract covered by such bond or bonds . . . the Surety shall be entirely within its rights and remedies [sic] as Surety [to do so]."  *See* Pl. Ex. 3 (emphasis added).  Unlike the reference to the California Civil Code provisions in *American Fidelity*, relevant only where a default was imminent, Article 19 does not imply a default and, in any event, concerns the discretion of the surety.  *See* 513 F.2d at 1380.

As of October 17, 2002, USPS had knowledge that five subcontractors were not paid.  *See* Pl. Ex. 8.  On January 27, 2003, Scotiabank sent USPS a request for the remittance of all future payments.  *See* Pl. Ex. 5.  On February 3, 2003, USPS contacted the General Manager of Selpa to confirm that future payments be made to Scotiabank and Selpa.  *Id.*  A letter by USPS dated February 4, 2003 notes that in a phone call, Selpa "notified [USPS] verbally . . . that [United Surety] wanted all future remittances to be issued as dual checks with them[.]"  *Id.*  None of these additional communications, however, were between United Surety and USPS.  Yet, it is the *surety's* duty to notify the Government of contractor default and request future payments.  *See Ins. Co. of the W. I*, 243 F.3d at 1371 ("[A] surety could sue the United States and recover not only any retainage but also any amounts paid by the United States to the contractor *after the surety had notified the government*

*of default by the contractor* under the bond.") (emphasis added); *see also Am. Ins. Co.*, 62 Fed. Cl. at 155 ("Because the surety may decide that its interest[s] are best served by continuing to have payments sent directly to the principal contractor, constructive notice that a contractor has defaulted and the surety has taken over the performance of the contract is insufficient, standing alone, to trigger this form of subrogation.").

The Government's independent knowledge of contractor default is irrelevant.  As our appellate court observed in *Fireman's Fund*:

> That some subcontractors and suppliers had informed the government of [the contractor's] payment deficiencies prior to the release of the retainage does not substitute for notice by the surety and does not trigger the government's equitable duty to act with reasoned discretion toward it.  [The surety] simply cannot rely on [the contractor's] subcontractors or the government to protect its interests.  By definition and agreement the surety protects the government's interest, not the other way around.

909 F.2d at 499.

Overall, governing precedent holds that "only notice by the surety triggers the government's equitable duty," and that the notice must include "facts giving rise to an equitable right in the plaintiff surety company[.]"  *See Fireman's Fund*, 909 F.2d at 499; *Balboa Ins. Co.*, 775 F.2d at 1162.  The requirement that the surety provide notice of the contractor's default or imminent default to trigger the Government's equitable duty toward the surety is not an overly stringent requirement. *See Fireman's Fund*, 909 F.2d at 498-99 ("The [government] has an important interest in the timely and efficient completion of the contract work. . . . By definition and agreement the surety protects the government's interest, not the other way around.").  The Government "owes no equitable duty to a surety [] unless the surety notifies the government that the principal has defaulted under the bond." *Id*.  Because United Surety's November 12, 2002 letter to USPS demanded payment and cited an indemnity agreement between United Surety and the contractor, but failed to provide any evidence or claim of contractor default, USPS owed United Surety no equitable duty at the time the disputed progress payment was issued to Selpa and Scotiabank.

For these reasons, United Surety's November 4, 2008 Complaint must be dismissed for failure to state a claim upon which relief can be granted. *See* RCFC 12(b)(6).  Accordingly, the court does not need to address the merits of the Government's alternative argument that USPS would not have been required to withhold the March 26, 2003 payment from Selpa, even if United Surety had provided adequate notice, "because USPS was already retaining funds in excess of [United Surety's] alleged subrogation rights." *See* Gov't Mot. at 9.

**V.     CONCLUSION.**

The court has determined that November 4, 2008 Complaint has failed to state a claim upon which relief can be granted.  *See* RCFC 12(b)(6).  The Government's January 22, 2009 Motion is granted.  The Clerk of the Court is directed to dismiss the November 4, 2008 Complaint.

**IT IS SO ORDERED.**

s/ Susan G. Braden\_\_\_\_
**SUSAN G. BRADEN**
**Judge**